[No. A052241. First Dist., Div One. July 9, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
ELIECER C. ESCOBAR et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, IV, V, VI and VII.

## COUNSEL

Nella Bertin and Richard I. Targow, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, and Ronald E. Niver and Mary A. Roth, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

STRANKMAN, P. J.—Codefendants Eliecer C. Escobar and Ramon Z. Sotolongo were tried together and convicted by a jury of first degree burglary. (Pen. Code, § 459.) In the published portion of this opinion, we discuss Escobar's claim that the jury was not adequately instructed on the significance of a burglary perpetrator's multiple entries for purposes of determining aider and abettor liability. In the unpublished portion, we consider other contentions related to the admissibility of certain evidence, Sotolongo's impeachment with a misdemeanor conviction, the readback of testimony to the jury, and the sentences imposed. We affirm.

### I. FACTS

a. *Prosecution's Evidence*

Dennis McGrath and his wife live in an isolated house on Boonville Road. The house sits on a plateau with a severe drop-off on three sides; the only reasonable access is by way of a 750-foot-long, winding driveway, with a gate at the bottom.

Early in the evening on July 30, 1990, the McGraths went out to dinner. When they returned about two hours later, an unfamiliar Ford Pinto was

parked in front of their locked gate, and a strange man was walking down their driveway. The man mumbled about a car problem but declined their offer to call someone. After noting the Pinto's license number, the McGraths drove up their driveway.

Several lights were on; a man was standing in the open doorway, illuminated by the porch light. The man ran inside. McGrath ran into the house himself; he grabbed his pistol from his dresser drawer, loaded it, and began a search. The kitchen window was broken; the back door was locked.

Several videotapes were stacked in the fireplace; a radio and portable telephone which had been up in the loft were in the dining room. McGrath drove back down the driveway and noticed his golf clubs in the backseat of the Pinto. He shot out its tires. When he returned to the house, he noticed his videocassette recorder (VCR) and satellite dish receiver in a culvert beside the driveway.

McGrath described both men to the officer who responded to the scene, Deputy Sheriff Vanoni. Codefendant Escobar was found walking along Boonville Road, about a quarter of a mile away. He was breathing heavily and sweating; his knees and elbows were dirty and he had brush and grass in his hair. Keys in his possession opened the hatchback of the Pinto. Vanoni asked McGrath to look at Escobar, but McGrath said he had never seen Escobar before. However, several identifiable fingerprints were obtained from the radio in the McGrath house; two of those prints matched prints taken from Escobar after his arrest.

Codefendant Sotolongo was also found walking on Boonville Road. While being read his *Miranda* rights, Sotolongo repeatedly interrupted, saying several times, "I don't know nothing." Once, he added, "I don't know nothing about no broken window." At that time, the officer questioning him had not mentioned a broken window and knew nothing about a broken window. McGrath was sure Sotolongo was the man he had seen on the porch, based on his physical appearance and clothing.

McGrath and his wife were shown a photo lineup and positively identified an individual named Hector Estrada as the man at the bottom of the driveway. Estrada was the registered owner of the Pinto, and he was considered an additional suspect in the case, but apparently had not yet been arrested when Escobar and Sotolongo were tried.

None of the prints found in the residence or elsewhere matched those of either Sotolongo or Estrada.

### b. *Sotolongo's Defense*

Sotolongo, who was born in Cuba, testified through an interpreter. On July 30 he was in Ukiah and missed the bus for home. Estrada picked him up; Escobar was also in the car. Estrada parked in front of the gate on Boonville Road and said he would be right back; Sotolongo and Escobar sat talking and smoking. Estrada returned with a golf bag, put it in the car, and told Escobar to come with him. Escobar went up the driveway with Estrada. Sotolongo waited for 10 or 15 minutes, then went out to the road to see if he could get a lift home. After he walked and hitchhiked for a while, the police stopped him. Sotolongo denied making any statements about a broken window. He did not break into McGrath's house or steal anything and did not go on the other side of the gate.

### c. *Escobar's Defense*

Escobar also testified through an interpreter. He too was born in Cuba. On July 30 he went with Estrada to Hopland and Ukiah; Estrada was driving the Pinto. They drank beer most of the day. As they left Ukiah, they picked up Sotolongo. At some point Estrada stopped. Escobar was somewhat drunk and did not ask why. Estrada got out of the car; a little later he came back with a bag of golf clubs. Estrada told Escobar, "Come on." Escobar grabbed the keys to guard them and followed Estrada up the driveway, but did not know why or what was going on. As Escobar approached the house, he saw Estrada with a white radio. Estrada told Escobar to take the radio to the car. Escobar said, "What's this? What is going on here?" He put the radio on the ground and took off. He never went inside the house. He ran out back, down the side of a hill, to Boonville Road. He did not go down the driveway because he did not want to have anything more to do with the car. He knew he could be in trouble because he was "on the scene of a robbery," and wanted to get out of there.

## II. EVIDENTIARY ISSUES (Escobar & Sotolongo)*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## III. JURY INSTRUCTIONS ON AIDNG AND ABETTING

The court instructed with CALJIC Nos. 3.00 (defining principals), 3.01 (defining aiding and abetting), and 3.03 (explaining how aider and abettor may end responsibility for a crime). Next, it gave a special instruction requested by Escobar which stated, "The intent to aid and abet a burglary

---

*See footnote, *ante*, page 1430.

must be formed prior to or at the time of the entry." Thereafter, it instructed on the elements of burglary and the specific intent required for that offense.

 Escobar contends the court erred by not instructing sua sponte with CALJIC No. 14.54 (1989 new) (5th ed. pocket pt.), which provides, "In order for an accused to be guilty of burglary as an aider and abettor, [he] [she] must have formed the intent to encourage or facilitate the perpetrator prior to or at the time [that person] . . . made the entry into the _____ with the required specific intent." He reasons that his own special instruction was inadequate because it did not make clear that under his version of the facts, it was the perpetrator's entry (i.e., that of Estrada), not Escobar's entry, if any, which determined whether Escobar had the requisite intent to aid and abet.

When a defendant is accused of burglary on an aiding and abetting theory and the evidence supports an inference that he did not learn of the perpetrator's criminal purpose until after that person left the building, CALJIC No. 3.01 does not adequately inform the jury about when the accused must have become aware of the perpetrator's unlawful purpose. (*People* v. *Brady* (1987) 190 Cal.App.3d 124, 135-137 [235 Cal.Rptr. 248]; *People* v. *Macedo* (1989) 213 Cal.App.3d 554, 558-559 [261 Cal.Rptr. 754].) In such a case, the trial court has a sua sponte duty to provide a more precise instruction that the aider and abettor's intent must be formed prior to or at the time of the burglar's entry. (*Id.*, at p. 560.) CALJIC No. 14.54 satisfies that requirement.

Here, the instruction requested by Escobar and given by the court was not quite as exact as CALJIC No. 14.54. However, heard in context, the instruction could not have been misleading. The instruction was preceded by instructions distinguishing between direct perpetrators and aiders and abettors and defining aiders and abettors. The only possible meaning of Escobar's special instruction was that the aider and abettor's intent had to be formed before or at the time of the *perpetrator's* entry. That instruction was not amenable to the strained reading he now ascribes to it.

 Next, Escobar contends the court erred by not instructing sua sponte on the significance of a burglary perpetrator's multiple entries for purposes of determining aider and abettor liability. Escobar reasons that in this case, the burglary was complete at the moment the perpetrator, whom he claimed was Estrada, first entered the residence through the window, and that Estrada's second entry to get more loot did not constitute a separate burglary. Escobar then reasons that he could be convicted on an aiding and abetting theory only if he formed the intent to aid Estrada before or at the time of Estrada's initial entry, not if his knowledge and intent arose just before Estrada's second entry.

Although a trial court must instruct sua sponte on general principles of law relevant to the issues raised by substantial evidence, we conclude that no additional instruction was required here, as Escobar's analysis of the state of the law is incorrect.

We recognize that several Courts of Appeal have held an aider and abettor to burglary must form the intent to facilitate the crime before or at the time of the perpetrator's entry, not afterward. The underlying rationale is that the crime of burglary is complete once the perpetrator enters the premises with the requisite intent. (See, e.g., *People* v. *Macedo, supra,* 213 Cal.App.3d at pp. 558-561; *People* v. *Forte* (1988) 204 Cal.App.3d 1317, 1322 [251 Cal.Rptr. 855]; *People* v. *Brady, supra,* 190 Cal.App.3d at pp. 132-134.) But because each of these cases involved only a single entry into a residence, they are not dispositive here.

Recently, however, in *People* v. *Cooper* (1991) 53 Cal.3d 1158 [282 Cal.Rptr. 450, 811 P.2d 742], the Supreme Court restated several general principles of aider and abettor liability which are instructive, even though the crime at issue was robbery, not burglary. ██ The court emphasized that to prove guilt on a theory of aiding and abetting liability, the prosecution must show that the aider and abettor intended to facilitate or encourage the principal offense *prior to or during* its commission. (*Id.,* at pp. 1160, 1164.) The fixed moment when the elements of a crime have been satisfied and the direct perpetrator may be found guilty of the substantive offense, rather than just an attempt, is not necessarily synonymous with the commission of that crime for purposes of determining aider and abettor liability. Instead, the duration of an offense for purposes of aider and abettor liability continues until all acts constituting the offense have *ceased.* (*Id.,* at p. 1164.)[1]

The *Cooper* court explained, "The logic of viewing 'committed' as a fixed point in time for purposes of guilt-establishment and 'commission' as a temporal continuum for purposes of determining accomplice liability can be seen from the perspectives of both the victim and the accomplice. The rape victim, for example, would not agree that the crime was completed once the crime was initially committed (i.e., at the point of initial penetration). Rather, the offense does not end until all of the acts that constitute the rape have ceased. Furthermore, the unknowing defendant who happens on the scene of a rape after the rape has been initially *committed* and aids the

---

[1]The *Cooper* court did comment on aider and abettor liability for burglary by noting, "[t]he rule has developed in the Courts of Appeal that one who forms the intent to aid a burglar *after the acts constituting the burglary have ceased* cannot be liable as an aider and abettor to the burglary. [Citations.]" (*People* v. *Cooper, supra,* 53 Cal.3d at p. 1169, fn. omitted, italics added.)

perpetrator in the continuing criminal acts is an accomplice under this concept of 'commission,' because he formed his intent to facilitate the commission of the rape *during its commission*." (53 Cal.3d at pp. 1164-1165, fn. 7.)

A somewhat similar approach seems appropriate when the substantive offense is a burglary involving repeated entries by the direct perpetrator during a short time to carry away loot or load a getaway vehicle. ▉ For purposes of establishing the direct perpetrator's guilt, the burglary is complete upon the initial entry with felonious intent. The subsequent entries do not constitute separate burglaries, notwithstanding the rule that the "gist" of burglary is entry into a structure with felonious intent. (See *In re William S.* (1989) 208 Cal.App.3d 313, 316-319 [256 Cal.Rptr. 64] [second entry into burglarized home several hours after first entry constitutes second burglary, as burglars had reasonable time to reflect upon their conduct before the reentry; dictum that series of brief entries to load nearby getaway vehicle should perhaps be viewed as one continuous course of conduct and one crime].) Nevertheless, it does not follow that the perpetrator's felonious intent has evaporated or ceased simply because the crime is technically complete; instead, that same intent obviously continues during the subsequent entries. The individual who happens on the scene after the initial entry, becomes aware of the perpetrator's unlawful purpose, and intentionally assists during the subsequent entries, aids and encourages commission of the offense as surely as if that individual's knowledge had preceded the perpetrator's initial entry.

We conclude, therefore, that to establish aider and abettor liability for burglary in a case involving multiple entries by the direct perpetrator during a brief time period, the accused need only have formed the intent to encourage or facilitate the perpetrator before or during any one of the perpetrator's entries with the required specific intent. Any other conclusion would be inconsistent with reasonable concepts of culpability and would defeat the primary rationale for punishing aiders and abettors as principals, i.e., to deter them from aiding or encouraging the commission of offenses. (See *People* v. *Cooper, supra*, 53 Cal.3d at p. 1168.)

In this case, the jury was adequately instructed that an aider and abettor's intent must arise before or during the perpetrator's entry. No clarifying sua sponte instruction on multiple entries was required, because whether that intent arose before the first or second entry was insignificant.

## IV.-VII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### VIII. DISPOSITION

The judgments are affirmed.

Newsom, J., and Stein, J., concurred.

A petition for a rehearing was denied August 10, 1992, and appellants' petition for review by the Supreme Court was denied October 15, 1992.

---

*See footnote, *ante*, page 1430.